UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH SEIBERT, et al.,<br><br>                                    Plaintiffs,<br><br>                    -against-<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for SIGNATURE BANK, N.A. AND SIGNATURE BRIDGE BANK, N.A.,<br><br>                                    Defendant. | 24-CV-427 (JGLC)<br><br>**<u>OPINION AND ORDER</u>** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Joseph Seibert, David D'Amico, Sarmen Saryan, Quinn Leahy, and Jason Cahn (collectively, "Plaintiffs") bring this action against Federal Deposit Insurance Corporation ("FDIC"), as receiver for Signature Bank, N.A. ("Signature" or the "Bank") and Signature Bridge Bank, N.A. ("SBB") alleging breach of contract, breach of the implied covenant of good faith and fair dealing, quasi contract (promissory estoppel and quantum meruit), and violations of Article 6 of the New York Labor Law, Sections 191, 193, and 198(1-a). Plaintiffs allege that for four consecutive years, they received annual bonuses in the form of cash and restricted stock (70% cash and 30% stock), but that they were wrongfully denied their full 2022 bonuses despite being told they had already been approved by Signature management. Shortly thereafter, Signature was placed into receivership by FDIC, and Signature employees, including Plaintiffs, attended an all-hands meeting with the newly appointed CEO, Greg Carmichael. At this meeting, Carmichael promised that employees would get cash payments based on the restricted stock they already held that was set to vest in 2023 and in the future. After Plaintiff Seibert confirmed the authenticity of the promise with Signature's then Chief Operating Officer, which included correspondence via text. Plaintiffs remained in their roles only to be terminated a few days later.

As set forth below, New York courts have consistently found that an employee's entitlement to a bonus depends on their employer's policies. Plaintiffs, as employees subject to an unambiguous discretionary bonus policy, have failed to allege their 2022 bonuses were non-discretionary or truly guaranteed, and accordingly they cannot maintain claims with respect to those unpaid bonuses. However, Plaintiffs have adequately pled a clear promise by Greg Carmichael at the all-hands meeting for payment based on the restricted stock they held, and so to the extent Plaintiffs' claims rely on that promise, they will be permitted to go forward. Accordingly, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the Amended Complaint and presumed to be true for the purposes of the instant motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

Signature was founded in May 2001 by Joseph DePaolo, John Tamberlane, and Scott Shay. ECF No. 26 ("Am. Compl.") ¶ 24. Signature mostly operated as a regional bank, but beginning in 2018, it expanded, and as part of the expansion, Signature employed Plaintiff Seibert and his team (Plaintiffs D'Amico and Saryan) from Metropolitan Commercial Bank in January 2018. *Id.* ¶¶ 25, 26. Each of the Plaintiffs worked as a member of Signature's Digital Assets Group (the "DA Group"), which is one of Signature's over 150 private client groups. Am. Compl. ¶ 2. Plaintiff Joseph Seibert led the DA Group from 2018 onwards. *Id.* By the end of 2020, the DA Group was responsible for $32.5 billion in deposits. *Id.* ¶ 35. At all times during their employment, Plaintiffs never possessed any policymaking or managerial authority outside the DA Group. *Id.* ¶ 35 n.2.

Plaintiffs received a base salary (*id.* ¶ 36) and were eligible to receive a discretionary bonus. Signature's employee handbook (the "Handbook"), in a section titled "Discretionary Bonus Program," indicated:

> We may recognize your contribution to [Signature] and reward that contribution in the form of a discretionary bonus. While our discretionary bonus program is designed to reward those who meet or exceed performance levels set forth by their manager for their position, it is not a guaranteed payment. Bonus parameters are determined by Executive Management based on Signature's performance for the year, market and financial conditions, your business line's group performance, and other factors.

ECF No. 34-1 at 45.[1] The Handbook also advised that it shall not be deemed to create an express or implied contract. Am. Compl.¶ 42. In addition, the Handbook Acknowledgment (which an employee would have signed) stated that any employment terms different from those contained in the Handbook needed to be reduced to an express written contract or agreement. ECF No. 34-1 at 141. In signing the acknowledgment, an employee would have represented they "received and read a copy of Signature's Employee Handbook, including any applicable supplements" and understood that "the policies, rules and benefits described in it are subject to change at the sole discretion of Signature at any time, unless otherwise restricted by applicable law." *Id.*

Since the founding of the DA Group in 2018, all members, including each of the Plaintiffs, were paid annual commission bonuses calculated by reference to a group-wide "grid" which outlined a set of objective performance metrics. Am. Compl. ¶ 3; *see* ECF No. 26-6. The performance metrics were subject to change from year to year and depended on the percentage of net income of the DA Group. Am. Compl. ¶ 38; ECF No. 26-6. However, the actual bonuses to Plaintiffs were always paid in the same manner:

---

[1] The Handbook is incorporated by referenced because it is quoted and discussed in the Amended Complaint, and the Court may thus consider it in connection with the instant motion. *See Toussaint v. Cnty. of Westchester*, 615 F. Supp. 3d 215, 221 n.4 (S.D.N.Y. 2022).

70% in cash in the first quarter of the following year, with the remaining 30% paid in restricted stock that vested over time. Am. Compl. ¶ 3.

In February of 2022, Signature's Chief Executive Officer Joseph DePaolo and Chief Operating Officer Eric Howell presented Plaintiff Seibert with a written copy of the DA Group's grid for the following year. *Id.* ¶ 38. Plaintiff Seibert, as head of the DA Group, would allocate the bonus pool to members. *Id.* ¶ 39. These allocations were typically provided to Signature's senior management in November or December, then approved by the end of the year. *Id.* Plaintiffs relied on this structure and the Signature grid bonus system. *Id.* ¶ 40.

In December 2022, Signature approved the bonus compensation for the 2022 fiscal year, which included a meeting between Signature management (CEO DePaolo and COO Howell) and Plaintiff Seibert, in which Signature management approved the bonuses and confirmed the bonus payouts would follow the 70% cash and 30% stock split. *Id.* ¶ 43. Heading into early 2023, Plaintiffs had been told their 2022 bonuses had been approved by senior Bank management. *Id.* ¶ 3.

But in January 2023, Signature informed three of the Plaintiffs—Seibert, D'Amico, and Saryan—that they would actually be paid 80% of their bonuses in restricted stock, and 20% in cash. *Id.* ¶ 4. These Plaintiffs stood to receive the highest payouts from the bonus pool in 2022. *Id.* ¶ 44. Throughout 2022, Plaintiffs were not given any indication this change would occur. *Id.* ¶ 41. None of the three Plaintiffs agreed to this distribution and were not given an opportunity to object. *Id.* ¶ 45. Ultimately, none of the Plaintiffs received any of their restricted stock awards. *Id.* ¶ 46. However, the cash portions of the bonuses were paid to each of the Plaintiffs in February 2023. *Id.*

In March 2023, FDIC and the New York State Department of Financial Services placed Signature into receivership. *Id.* ¶ 5. FDIC is an independent agency created by the U.S. government to oversee and promote public confidence in the banking system. *Id.* ¶ 16. FDIC appointed Greg Carmichael, a banking executive, as CEO to run Signature and the newly created Signature Bridge Bank ("SBB"), the latter of which FDIC described as the successor to Signature. *Id.* ¶¶ 6, 49. FDIC, Signature, and SBB executed an agreement (the "Transfer Agreement") which provided, among other things, that FDIC retained all agreements establishing the compensation, benefits, or terms of employment. *Id.* ¶ 50.

At an "all-hands" meeting on March 13, 2023, Carmichael promised Signature employees two things to incentivize them to stay. *Id.* ¶ 52. First, that any restricted stock awards that would vest *in 2023* would be paid out in cash by the end of the month. *Id.* Second, that any restricted stock scheduled to vest *in the future* would also be paid out in cash on an unspecified, but accelerated, time frame. *Id.* Plaintiff Seibert spoke with Signature COO Howell on March 14, 2023 to confirm the authenticity of Carmichael's promise, and was told that he and his team, including Plaintiffs, would get "at least" the payout promised for the end of March. *Id.* ¶ 53. Howell also represented, in a text, that the payout would be based on the value of shares as of the grant date, not the then-current value of Signature stock. *Id.* Plaintiffs remained at Signature based at least in part on these representations. *Id.* ¶ 84. On March 14, 2023, Signature COO Howell asked Plaintiffs to unwind Signature's book of digital asset-industry cash deposits as quickly as possible, including billions in new deposits that Plaintiffs had secured, as requested by Signature management, just a week prior. *Id.* ¶ 56. Plaintiffs fulfilled the request and offloaded $12 billion in cash deposits by the end of that week. *Id.*

On March 19, 2024, Signature was sold to Flagstar Bank, and Plaintiffs were terminated without receiving the equity components of their bonuses or any severance payments. *Id.* ¶ 57. When Plaintiff Seibert asked Howell to confirm this was correct, Howell stated "Correct. You get nothing." *Id.* Other members of the DA Group were subsequently hired by Flagstar. *Id.* ¶ 60. Plaintiffs were not.

Plaintiffs timely filed proofs of claim with FDIC outlining their entitlement to cash bonuses and accelerated stock paid out in cash, as well as statutory damages, interest, and fees under New York Labor Law. *Id.* ¶¶ 8, 61. At FDIC's request, Plaintiffs supplemented their claims forms by letter dated October 27, 2023 stating that the records to support their claims were in Flagstar's possession. *Id.* ¶¶ 64–65. FDIC rejected Plaintiffs' claims in a letter dated November 22, 2023. *Id.* ¶ 66.

Subsequently, on January 19, 2024, Plaintiffs filed this action against FDIC for breach of contract, quasi contract (promissory estoppel and quantum meruit), and violations of Article 6 of New York Labor Law ("NYLL")—specifically Sections 191, 193, and 198(1-a). ECF No. 1. On May 7, 2024, Plaintiffs filed an amended complaint adding several factual allegations and a claim for breach of the implied covenant of good faith and fair dealing. ECF No. 26. On June 11, 2024, FDIC filed the instant motion to dismiss. ECF Nos. 32, 33 ("Mem.").

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## DISCUSSION

The below discussion proceeds in five sections. The Court first determines that Signature's discretionary bonus policy precludes a breach of contract claim for the unpaid bonuses, but finds that Plaintiffs have stated a claim for breach of an implied-in-fact contract with respect to Carmichael's promise at the March 2023 all-hands meeting. The Court next dismisses Plaintiffs' claim alleging breach of the implied covenant of good faith and fair dealing as duplicative. Third, the Court finds that Plaintiffs have failed to establish an entitlement to recovery in quantum meruit because they were paid a salary for their work and did not have a reasonable expectation of compensation beyond that because of the unambiguous discretionary bonus policy. Fourth, the Court concludes that Plaintiffs fail to state a claim for promissory estoppel because they fail to allege any injury from their purported reliance. Finally, the Court finds that Plaintiffs have stated a claim under Article 6 of the NYLL with respect to Carmichael's 2023 promise only.

I.    **Plaintiffs Adequately Plead a Claim for Breach of Contract**

Plaintiffs' first Count alleges that the "grid" document, combined with the approval by Signature senior management of allocation of bonuses to Plaintiffs and the confirmation of the bonus pool size, created a binding agreement "to pay their earned and approved bonuses." Am. Compl. ¶ 68. Plaintiffs also contend an agreement was made by Carmichael's promise at the March 2023 all-hands meeting, which was confirmed via text by Signature management. *Id.* ¶¶ 53, 54. Defendant contends that Plaintiffs have failed to allege facts showing that Signature's management had a specific intent to create a binding, non-discretionary obligation to pay bonuses. Mem. at 9. Defendant also argues that, in any event, the Handbook expressly stated that bonuses were discretionary and not guaranteed. Mem. at 10–13. For the reasons set forth below, the Court finds that the discretionary bonus policy precludes Plaintiffs' claim with respect to the grid and the 2022 approval, but that Plaintiffs sufficiently state a claim for breach of contract based on Carmichael's promise at the all-hands meeting.

A.    **No Contract Formed by 2022 Approval or Grid Document**

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 142 (2d Cir. 2011)). A contract may be express or implied.

New York courts have provided guidance where, like here, a plaintiff alleges breach of contract based on unpaid bonuses. "An employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." *Hall v. United Parcel Serv. of Am*., 76 N.Y.2d 27, 36 (1990). As a result, "a plaintiff cannot recover under New York law for breach of contract due to

his employer's failure to pay him compensation pursuant to a plan, where the plan vests the employer with absolute discretion as to the entitlement and amount of any payments thereunder." *Doolittle v. Nixon Peabody LLP*, 6 N.Y.S.3d 864, 866 (4th Dep't 2015) (internal citation omitted); *see also Namad v. Salomon Inc.*, 74 N.Y.2d 751, 753 (1989) (concluding that plaintiff's breach of contract claim for unpaid bonus had been properly dismissed where the bonus clause had unambiguously vested discretion in management).

However, there are two relevant exceptions to this general rule. First, New York has "a long-standing policy against forfeiture of earned wages," *Gruber v. J.W.E. Silk, Inc*., 859 N.Y.S.2d 650, 651 (1st Dep't 2008), "which may apply to bonuses as well." *Doolittle*, 6 N.Y.S. 3d at 866. Therefore, unless an employer clearly indicates that bonuses are discretionary, the issue of whether unpaid incentive compensation under a defendant's bonus plan constitutes a discretionary bonus or earned wages not subject to forfeiture is a question to be submitted to a factfinder. *Id.* Second, New York courts "may enforce an agreement to pay an annual bonus made at the onset of the employment relationship where such bonus constitutes an integral part of [a] plaintiff's compensation package." *Mirchel v. RMJ Securities Corp*., 613 N.Y.S.2d 876, 878 (1st Dep't 1994) (internal citation omitted).

Based on the above, the relevant questions are (1) whether Signature "clearly" indicated its bonuses were discretionary; and (2) whether, at the onset of Plaintiffs' relationship with Signature, Signature indicated that bonuses would be an integral part of their compensation. The Court finds that both must be answered in Signature's favor.

Plaintiffs cannot sustain a claim for breach of contract based on the grid or 2022 approval conversations. The Handbook unambiguously provided that bonus payments were discretionary and not guaranteed—and therefore no express or implied in fact contract was formed on this

basis. *See* ECF No. 34-1 at 45. There was, therefore, no intent by Signature to form a separate agreement. Among other things, the Handbook clearly states, in a section titled "Discretionary Bonus Program," that Signature "may" recognize an employee's contribution in the form of a bonus but that it is not a "guaranteed payment." *Id*. Still, Plaintiffs argue that the Handbook's language stating "[a]uthorized bonus awards are paid annually, following the end of a calendar year," indicates that Signature loses discretion over bonus payment when bonuses are approved. ECF No. 39 ("Opp.") at 9. But this alone cannot plausibly establish an intention by Signature to annul the discretion they expressly reserved. Indeed, the plain meaning of that language is to identify *when* payments will be made, not to promise that an employee will get a bonus. In addition, the Handbook Acknowledgment unambiguously states that any employment terms different from those contained in the Handbook needed to be reduced to an express written contract or agreement. ECF No. 34-1 at 141.

Plaintiffs have also not plausibly alleged that a bonus payment was integral to their compensation from the outset of their employment. Plaintiffs have not alleged any facts supporting the inference that Signature agreed to or promised a non-discretionary bonus as part of their compensation. Rather, Plaintiffs just received a base salary and the discretionary bonuses at issue. Am. Compl. ¶ 36. At most, Plaintiffs have alleged that at the beginning of each year, Signature management would provide a grid to the DA Group, but nothing on the grid indicates any guarantee of a bonus, or indication of intent by Signature to depart from their usual discretionary policy. *See* ECF No. 26-6. At most, it demonstrated, based on information from the beginning of the year, the bonus amounts the employees *could* receive.

None of the cases Plaintiffs cite compel a different result. For example, Plaintiffs cite *Sipkin v. Major League Baseball Advance Media, L.P.*, No. 570623/04, 2005 WL 2653955 (Sup.

Ct. Oct. 17, 2005) for that proposition that where a bonus has already been earned by the time the employer decides not to pay it, the latter can no longer argue that bonus is discretionary. Opp. at 6. However, the court only reached that conclusion because the offer letter sent to the plaintiff gave no indication that the bonus was in any way discretionary. *See Sipkin*, 2005 WL 2653955, at *1. Plaintiffs have not alleged they received an offer letter or anything similar indicating they would receive a non-discretionary bonus. Plaintiffs' attempt to invoke *Berardi v. Fundamental Brokers, Inc.*, Opp. at 12, also fails because in that case, the employer did not state bonuses were discretionary, and in fact, the parties only disputed "the nature and timing" of bonus payments, not whether bonus payments needed to be made. 1990 WL 129174, at *1 (S.D.N.Y. Aug. 30, 1990).

Plaintiffs also rely on *Guggenheimer v. Bernstein Litowitz Berger & Grossmann LLP*, Opp. at 19, but there, the court found the assertion regarding the law firm's policy of bonuses being discretionary conflicted with the plaintiff's allegations she entered "into an explicit oral employment agreement, reaffirmed by the statements of two of its partners that plaintiff was assured of receiving a bonus as part of her compensation." 810 N.Y.S.2d 880, 885–86 (Sup. Ct. Feb. 24, 2006). Moreover, in *Guggenheimer*, when the plaintiff was hired, the law firm had informed her she would be eligible for a bonus if she brought in business, and this bonus was essentially pitched as a way for the associates to earn additional income. *Id.* at 882–83. Plaintiffs have not made similar allegations here, and in any event, as previously stated, the 2022 bonus approval conversations could not be considered an "integral" part of Plaintiffs' compensation because these alleged assurances were not made "at the onset of the employment relationship." *Mirchel*, 613 N.Y.S.2d at 878.

Finally, to the extent Plaintiffs argue that Signature's payment of the cash portion of their bonuses evinces an agreement by partial performance, that argument fails because Signature's conduct remains consistent with bonuses being discretionary. And standing alone, it would not evince an intent by Defendant to be bound by a separate implied in fact contract. Accordingly, the Court finds that Plaintiffs have not plausibly alleged that there was intent by Signature to enter into a separate contract with Plaintiffs to pay a 2022 bonus by reference to the grid and the approval of the bonuses. *See O'Grady v. BlueCrest Cap. Mgmt. LLP*, 646 F. App'x 2, 4 (2d Cir. 2016) (summary order) (holding that where employer agreement unambiguously stated bonus program was subject to its sole and absolute discretion, plaintiff was precluded "from claiming that nonpayment of bonus was a breach of contract.").

### B. An Implied-In-Fact Contract Was Formed by Carmichael's Promise in March 2023 and Signature COO Howell's Text

The Court does find, however, that Plaintiffs have plausibly stated a claim for breach of an implied-in-fact contract based on Carmichael's promise at the March 2023 all-hands meeting and Howell's subsequent text message. The Amended Complaint alleges Carmichael stated that any restricted stock awards that would vest in 2023 would be paid out in cash by the end of the month. Am. Compl. ¶ 52. The Amended Complaint also alleges Carmichael stated that any restricted stock scheduled to vest in the future would also be paid out in cash on an accelerated time frame. *Id.* Plaintiff Seibert spoke with Howell on March 14, 2023 to confirm the authenticity of Carmichael's promise, and was told that he and his team, including Plaintiffs, would get "at least" the payout promised for the end of March. *Id.* ¶ 53. Howell also represented, in a text, that the payout would be based on the value of shares as of the grant date, not the then-current value of Signature stock. *Id.*

These facts are sufficient to state an implied-in-fact contract, and the discretionary bonus policy does not apply because these are promises with regard to a completely different category of payments. Under New York law, a contract implied in fact may result as an "inference from the facts and circumstances of the case . . . derived from the presumed intention of the parties as indicated by their conduct." *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506–07 (2d Cir. 2009)). An implied contract requires the same elements as an express contract, including consideration, mutual assent, legal capacity and legal subject matter. *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93–94 (1999). It also requires a showing that there was a "meeting of the minds." *I.G. Second Generation Partners, L.P. v. Duane Reade*, 793 N.Y.S. 2d 379, 382 (1st Dep't 2005).

Here, the Amended Complaint plausibly alleges intention by Carmichael, consideration between SBB (making the payments) and employees (staying at the company), and acceptance by Plaintiffs by staying at the company. While, as Defendant notes, the Amended Complaint does not specifically allege that Carmichael conditioned this promise on an employee staying at the company, it is a more than reasonable inference based on the dire economic situation of Signature, which had just been placed into receivership by FDIC.

Accordingly, Defendant's motion to dismiss Plaintiffs' breach of contract claim is denied with respect to this implied-in-fact contract.

## II.  Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing is Dismissed as Duplicative

Plaintiffs' second Count alleges that Signature breached the implied covenant of good faith and fair dealing by changing the 2022 bonus structure after it had already been approved by management. Opp. at 17–18; Am. Compl. ¶¶ 78–86. "Under New York law, parties to a contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the

underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (internal citation omitted). There is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." *Id*. at 81. Therefore, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

Here, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is duplicative of the claim for breach of contract, because the alleged breach of contract (not paying the 70/30 bonus split) is materially the same allegation underlying this claim (that Signature "abus[ed] its discretion to switch Plaintiffs' bonus payout structure"). Opp. at 17. It is therefore dismissed with prejudice as duplicative.

### III.    Plaintiffs Fail to State a Claim for Quantum Meruit

Plaintiffs' third cause of action is for quantum meruit. Am. Compl. ¶¶ 87–90. Plaintiffs allege they performed services at the "specific request" of Signature and SBB and that they have not received the reasonable value of those services. *Id.* In order to recover in quantum meruit, a plaintiff must prove "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Soumayah v. Minnelli*, 839 N.Y.S.2d 79, 81 (1st Dep't 2007); *accord Moses v. Savedoff*, 947 N.Y.S.2d 419, 424 (1st Dep't 2012). Plaintiffs fail to allege facts to support the first, third, and fourth elements.

Plaintiffs have not alleged any specific services they rendered to Signature outside of the usual scope of their job responsibilities for which they received a base salary. And as to the third

element, a quantum meruit claim may not be used to recover the value of services rendered if, because of the relationship between the parties, it would be natural to assume such services would be rendered without compensation. *See Killian v. Captain Spicer's Gallery, LLC*, 96 N.Y.S.3d 433, 435 (4th Dep't 2019). Plaintiffs received a base salary and a bonus, the latter of which is subject to the discretionary policy by Signature. And as to the fourth factor, Plaintiffs have not alleged their base salary was unreasonable.

In short, by its plain terms, the Handbook offered discretionary bonuses to *recognize* an employee's contribution and to "reward" that contribution, not to *compensate* them for typical job responsibilities. Plaintiffs' claim for quantum meruit is thus dismissed with prejudice. *See Karmilowicz v. Hartford Fin. Servs. Grp.*, No. 11-CV-539 (CM) (DCF), 2011 WL 2936013, at *12 (S.D.N.Y. July 14, 2011), *aff'd sub nom. Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153 (2d Cir. 2012) (summary order) (dismissing quantum meruit claim because plaintiff had been paid salary for his work).

## IV.    Plaintiffs State a Claim for Promissory Estoppel Based on the 2023 Promise

Plaintiffs' fourth cause of action is for promissory estoppel based on "clear and unambiguous promises" from Carmichael with regard to the accelerated vesting and cash, and with regard to the 2022 bonus grid and Signature management approval of those bonuses. Am. Compl. ¶¶ 43, 91–94. Courts in this Circuit have observed that a claim for promissory estoppel is duplicative of a claim for breach of contract unless the plaintiff alleges that the defendant had a duty independent from any arising out of a contract. *Hallett v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020). "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (1987).

15

However, where, as here, a defendant "disputes the existence of a valid, enforceable contract, Plaintiffs are permitted to proceed on both contractual and quasi-contractual theories." *Hallett*, 481 F. Supp. 3d at 307 (quoting *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08-CV-10578 (RJS), 2010 WL 1257326, at *9 n.6 (S.D.N.Y. Mar. 12, 2010); *see also Rapay v. Chernov,* No.16-CV-4910 (DLC), 2017 WL 892372, at *5 (S.D.N.Y. Mar. 6, 2017).

First, because the Court has concluded Plaintiffs have plausibly alleged the existence of a valid, implied-in-fact contract as to Carmichael's March 2023 promise, the Court will also permit the claim to proceed on the alternative theory of promissory estoppel given that FDIC disputes the existence of any such contract. *See Goldberg v. Pace Univ.*, 88 F.4th 204, 215 (2d Cir. 2023) ("[A] plaintiff in a contract action may plead promissory estoppel claims in the alternative if there is 'a dispute over the existence, scope, or enforceability of the putative contract.'") (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999)); *Kasmin v. Josephs*, 212 N.Y.S.3d 608, 610 (1st Dep't 2024) ("Where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract . . . .") (cleaned up); *Diedhiou v. Republic of Senegal*, No. 20-CV-5685 (ER), 2021 WL 4461014, at *6 (S.D.N.Y. Sept. 29, 2021) (similar).

The Court next considers Plaintiffs' promissory estoppel claim with respect to the 2022 bonus approval and grid. "A cause of action for promissory estoppel under New York law requires that plaintiff prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) actual injury suffered as a result of her reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d. Cir. 2000); *accord Security Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014). In addition, where a plaintiff seeks to invoke promissory estoppel to evade the statute of frauds, they must demonstrate an unconscionable

injury. *See Philo Smith & Co., Inc. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) (holding promissory estoppel is properly reserved for cases involving unconscionable injury because otherwise, the public policy underlying the statute of frauds would be heavily undermined); *accord Bent v. St. John's Univ, N.Y.*, 138 N.Y.S.3d 199, 203 (2d Dep't 2020). Defendant has not raised any statute of frauds question or issue, and therefore, a showing of unconscionable injury is not required here.

Plaintiffs' claim fails with respect to the third element of promissory estoppel, as they have not alleged an actual injury suffered as a result of their supposed reliance. The February 2022 grid provided by Signature management would not amount to a clear and unambiguous promise, as it merely reflected the *potential* range of any bonus if it were awarded. The Amended Complaint has, however, plausibly stated a "promise" by alleging Plaintiffs were told that the 2022 bonuses were approved by senior management and would be paid in the usual 70/30 split. Am. Compl. ¶ 43.

But Plaintiffs fail to allege any detrimental reliance. Plaintiffs have not alleged, for instance, that they made large purchases in anticipation of the bonus payments, or turned down lucrative job offers. Plaintiffs have simply alleged that they have not received the expected bonus amounts, which is not an injury *caused* by their purported reliance. Without detrimental reliance, their claim for promissory estoppel cannot be maintained, and therefore it is dismissed with prejudice. *See CUNA Mut. Ins.* 769 F.3d at 816 ("To demonstrate promissory estoppel under New York law, a party must show reasonable and detrimental reliance upon a clear and unambiguous promise.").

Accordingly, Plaintiff's claim for promissory estoppel may only proceed based on the March 2023 promise by Carmichael.

**V.     Plaintiffs State a Claim for Violations of New York Labor Law with Respect to the Carmichael Implied-in-Fact Contract**

Plaintiffs' final Count alleges violations of NYLL Sections 191, 193, and 198(1-a). Plaintiffs argue that the portion of the cash bonuses wrongfully converted to stock, as well as the cash payments promised by Carmichael, constitute "wages" within the meaning of the statute. Am. Compl. ¶¶ 97–105. Defendant argues that Plaintiffs claims fail for essentially the same reason as their other claims: the bonuses were discretionary, and therefore do not qualify as "wages," and in addition, the bonuses were based on factors beyond Plaintiffs' performance. Mem. at 22–25.

New York Labor Law Section 193 prohibits employers from making "any deduction from the wages of an employee, and Section 190(1) broadly defines 'wages' as the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." *Kolchins v. Evolution Markets, Inc*., 31 N.Y.3d 100, 109 (2018) (internal quotation marks omitted). This Court has already concluded that Signature unambiguously conveyed that any bonuses were purely discretionary, and that the 2022 grid and management approval does not change that fact. Accordingly, Signature's decision to covert from a 70/30 split to an 80/20 split, and the decision to pay or not pay the bonuses, does not amount to a violation of the NYLL because it constitutes "[d]iscretionary additional remuneration . . . [which] falls outside the protection of the statute." *Truelove v. Ne. Cap. & Advisory, Inc*., 95 N.Y.2d 220, 224, (2000); *accord Kolchins*, 31 N.Y. 3d at 109. Additionally, because the Handbook provided that bonuses were based on a variety of factors, such as market performance, this fact too weighs against qualifying them as wages. *Beach v. Touradji Cap. Mgmt., LP*, 7 N.Y.S.3d 895 (1st Dep't 2015) (affirming dismissal where plaintiffs' compensation depended on factors other than their personal productivity).

18

However, to the extent Plaintiffs' claims rely on Carmichael's March 2023 promise, these claims may proceed. That promise did not involve discretionary bonus payments, but instead contemplated payment, in cash, based on restricted stock an employee already had. These could therefore properly be characterized as earned wages, and Defendant's motion is denied with respect to the implied-in-fact contract based on Carmichael's March 2023 promises.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. In addition, the discovery stay previously put in effect on April 24, 2024 (ECF No. 25) is HEREBY LIFTED. The Court will issue a separate order specifying a date and time for the parties to appear, via Microsoft Teams, for an initial pre-trial conference. The Clerk of Court is respectfully directed to terminate ECF No. 32.

Dated: March 28, 2025
       New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge